[Civ. No. 22182. Fourth Dist., Div. One..May 15, 1980.]

STATE BOARD OF EQUALIZATION, Plaintiff and Appellant, v. BOARD OF SUPERVISORS OF SAN DIEGO COUNTY et al., Defendants and Respondents.

COUNSEL

George Deukmejian, Attorney General, and Neal J. Gobar, Deputy Attorney General, for Plaintiff and Appellant.

Gray, Cary, Ames & Frye, Peter G. Aylward, William S. Boggs and Mark L. Mann for Defendants and Respondents.

OPINION

**GREER, J.**\*—The State Board of Equalization (Board) appeals the judgment denying its petition for writ of mandate. The issue presented is the validity of the Board's regulation which precludes reducing real property value if actual market value reduction occurs after the base assessment year under Proposition 13 (1975-1976). Because of the passage of Proposition 8[1] in November 1978, the issue of the regulation's application is limited to the taxable year 1978-1979. We affirm the decision of the trial court, holding the Board's regulation invalid.

---

\*Assigned by the Chairperson of the Judicial Council.

[1]An amendment clarifying Proposition 13.

FACTS

On June 6, 1978, the electorate adopted Proposition 13, adding article XIII A to the California Constitution.[2] The article was to go into effect July 1, 1978. 13 limited the increase on the value of taxable property to 2 percent per year. It also created a new method to be used in determining the value of real property for tax purposes. The taxable value would be based on the 1975-1976 full cash value until the property was purchased, new construction was begun, or the real property changed ownership. When one of the above events occurred, the property would be revalued at its fair market value on the date of the change. Unless one of the changes occurred, the taxable property value would not be increased from the 1976-1977 full cash value determination more than 2 percent per year, starting in 1978-1979. The value of real property for tax purposes was no longer the "current market value." Instead, the "acquisition value" was used in determining real property taxable value. However, no specific provisions for reduction due to depreciation or decrease in the fair market value were contained in the proposition.

On June 29, following the passage of 13, the Board adopted temporary tax rule 461(b), which provided: "461. (Cal. Adm. Code) Changes to Taxable Value...

"(b) *Depreciation.* The taxable value of real property shall not reflect changes for depreciation, appreciation or changes in zoning after the base assessment year full value has been established other than by the inflation rate."

Before rule 461(b) became final, the Board sent county assessors a letter containing "answers to some frequently asked questions regarding Proposition 13 implementation." Under the heading "Questions and Answers of a General Nature," the following hypothetical question was posed and dealt with summarily: "QUESTION: How do I handle declining property values because of physical, functional, or economic obsolescence?

"ANSWER: There are no provisions in Article XIII A which allow you to adjust for lower values for these reasons."

---

[2]Both article XIII A and Proposition 13 will hereafter be referred to as 13.

Three weeks later, the Board issued another letter dealing with a loss of value question as follows: "QUESTION: May the 1975 appraisal of an improvement be reduced in 1978 to recognize a loss in value suffered in 1977?

"ANSWER: No. A value reduction can only be recognized when a property is physically destroyed or otherwise physically removed, or upon a revaluation due to a change in ownership."

Effective October 2, the Board adopted final rules stating their position on reductions in taxable value to compensate for a decrease in actual market value. "Except for annual modification by the inflation rate or changes in value resulting from calamity or the removal of property or a portion thereof, the taxable value of real property shall not reflect any actual market value depreciation or appreciation, whether caused by zoning changes or otherwise, after the base assessment year full value has been established."

On August 18, 1978, the California Legislature adopted Senate Constitutional Amendment 67, eventually designated Proposition 8 (hereafter referred to as 8).

On November 7, 1978, the voters adopted 8, which amended the Constitution, specifically providing the acquisition value would be reduced to reflect a decline on real property value. The Board then adopted rule 461(d), expressly providing the "decline in value" amendment of 8 applied only prospectively to the 1979-1980 taxable year. Thus for the 1978-1979 taxable year, former rule 461(b) was applicable and required real property to be assessed and taxed without reflecting any decrease in actual fair market value.

Two months later, the San Diego Board of Supervisors amended the San Diego Appeals Board rule of notice and assessment procedure, providing one function of the assessment board is "[t]o exercise jurisdiction to review, equalize and adjust individual 1978-79 *assessments by taking into consideration* substantial damages, destruction or *other factors causing decline in value of real property....*" (Italics added.)

The action of the board of supervisors was a reaction to a chain of events beginning with the filing of applications for equalization with the San Diego County Assessment Appeals Boards, a split of opinion be-

tween the appeals boards, a request by one of the boards to the board of supervisors to convene an interboard conference "to discuss application of laws implementing Proposition 13 and 8 which San Diego County Assessment Appeals Boards have interpreted in different ways," and a recommendation of the San Diego County Grand Jury for action.

The assessment appeals boards then informed persons whose petitions for equalization had been denied of the adoption of the new rule promulgated by the board of supervisors.

The court below determined: "Pursuant to Article XIII A of the California Constitution (Proposition 13) as adopted June 6, 1978, and other provisions of law then in effect, the taxable value of real property for the 1978-79 taxable year shall in no event exceed the actual fair market value of such real property as of March 1, 1978, (the 'lien date' for the 1978-79 taxable year) and, therefore:

"That portion of Rule 461(b) of the State Board of Equalization Property Tax Rules adopted on June 29, 1978, to the extent said Rule 461(b) provides that 'the taxable value of real property shall not reflect changes for depreciation...or changes in zoning after the base assessment year full value has been established...' and that portion of Rule 461 adopted effective on October 2, 1978, to the extent said Rule 461 provides that 'Except for annual modification by the inflation rate or changes in value resulting from calamity or the removal of property or a portion thereof, the taxable value of real property shall not reflect any actual market value depreciation...whether caused by zoning changes or otherwise, after the base assessment year full value has been established...' were, from the outset, and are, erroneous, illegal and unconstitutional."

### SCOPE OF REVIEW

The Board argues its rules constitute quasi-legislative administrative action and, therefore, may be held invalid only if "arbitrary, capricious or without basis," citing *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].

The trial court in considering the identical contention, cited the case of *Mission Pak Co.* v. *State Bd. of Equalization* (1972) 23 Cal.App.3d

120 [100 Cal.Rptr. 69], where two questions were presented: First, whether the Board's administrative rules were invalid because they were either without authority or repugnant to the statutory provisions (a legal interpretation); and second, whether the trial court's finding relating to plaintiff's product was supported by competent evidence—was it candy or fruit for tax purposes (a factual decision). The court in *Mission Pak* stated as to the first question, "we recognize that the 'final responsibility for the interpretation of the law . . . rests with the courts.'" (*Id.*, at p. 124.) The court then went on to point out that whether the product was fruit or confection is a fact question and the Board's factual determination would be upheld unless arbitrary and capricious. The same distinction between factual and legal questions outlines the scope of review before this court.

The Legislature has delegated to the Board the responsibility of "prescribing" rules and regulations to govern local boards of equalization when equalizing and assessors when assessing. In addition, the Board shall "prepare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation. . . ." (Gov. Code, § 15606.)

The authority granted to the Board is limited by Government Code section 11374 which provides: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and *reasonably necessary to effectuate the purpose* of the statute." (Italics added.)

If the Board exercises its discretion within the scope of its authority, its conduct will not be disturbed by the courts (*Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1020-1021 [106 Cal.Rptr. 867]).

The court below stated quite properly, "it's my job to make the judgment. I can respectfully consider anyone's opinion, the Board of Equalization, the State Legislature and so forth, but it is still my job." We agree, as did the Supreme Court in *Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405], where, in discussing the extent of the court's authority to review the

Board's LEGAL DETERMINATIONS, the court stated: "Whatever the force of administrative construction...final responsibility for the interpretation of the law rests with the courts. 'At most administrative practice is a weight in the scale, to be considered but not to be inevitably followed .... While we are of course bound to weigh seriously such rulings, they are never conclusive.' [Citation.] An administrative officer may not make a rule or regulation that alters or enlarges the terms of a legislative enactment. [Citations.]"

The court below properly fulfilled its responsibility of interpreting the legal questions involved.

■■■ *The Board's tax rule, providing real property taxable value for 1978-1979 is not limited by fair market value, is void.*

The Board, by its ruling, seeks to alter 129 years of constitutional law. The people of California, since 1849, have relied upon the principle that "all property in this state shall be taxed in proportion to its value, to be ascertained as directed by law...." (Cal. Const. of 1849, art. XI, § 13.) This historical guaranty was reiterated in the 1974 revision of article XIII, section 1, of the Constitution.[3] Therefore, if there is any authority for the Board to alter this constitutional principle, it would have to be based upon 13.

---

[3]As part of the 1974 revision, the sentence "all property subject to taxation shall be assessed for taxation at its full cash value" was deleted from article XIII, section 37, paragraph 2, and moved with certain changes to the revised article XIII, section 1, as new subdivision (b), section 1, then read: "Section 1. Taxable property. Unless otherwise provided by this Constitution or the laws of the United States:

"(a) All property is taxable and shall be assessed at the same percentage of fair market value. *When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value.* The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value.

"(b) All property so assessed shall be taxed in proportion to its full value." (Italics added.)

However, the comment to this section by the constitutional revision task force that fair market value was to be the "general value standard" as follows: "Subdivision (a) restates the long established principle that all property shall be taxed uniformly unless an exception to the rule is made in the Constitution or the laws of the United States. Fair market value, a figure which can be derived by using any one or more of the standard 'approaches' to value—sales, income, cost, etc.—is established as the general value standard, but the existence of other constitutionally authorized standards is recognized. A uniform percentage is to be applied to the 'full value' to derive the assessed value."

Thus, the 1974 amendment contained the constitutional guaranty.

A fundamental rule of construction of any legal document is that the main object of the interpretation is to ascertain the intent of the parties who made the instrument and to give that intent the fullest effect possible consistent with the language of the provisions and the related body of law. The California Supreme Court in interpreting a previous constitutional amendment drew an analogy to interpreting a statute and stated, "[t]he intent prevails over· the letter, and the letter will, if possible, be so read to conform to the spirit of the act." (*Bakkenson* v. *Superior Court* (1925) 197 Cal. 504, 511 [241 P. 874].) "[T]he courts must interpret a constitutional amendment to give effect to the intent of the voters adopting it" (*In re Quinn* (1973) 35 Cal.App.3d 473, 483 [110 Cal.Rptr. 881]; *Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278]). An analysis of the voters pamphlet sheds light upon the intent of the voters, as recently stated in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], "when, as here, the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language" (*id.*, at pp. 245-246). Thus, we review those portions of the voters pamphlet for the June 6, 1978, election which dealt with 13 in order to determine intent.

In the official title and summary of the voters pamphlet prepared by the Attorney General, the entire valuation question was presented in two sentences: "[E]stablishes 1975-76 assessed valuation base for property tax purposes. Limits annual increases in value."

The analysis by the legislative analyst discussed the valuation matter as follows: "[T]he adjusted values could then be increased by no more than 2 percent per year as long as the same taxpayer continued to own the property."

The arguments in favor of 13 contained the following clause: "[L]imits yearly market value tax raises to 2% per year."

The rebuttal to argument against 13 stated: "Proposition 13 will make property taxes FAIR, EQUAL, and within the ABILITY to pay for all Californians."

A complete reading of the voters pamphlet fails to reveal how the electorate intended to relinquish the established constitutional guaranty

providing for taxation on *fair market value*. They merely voted to limit the increase in the value under certain stated circumstances. Article XIII, section 1, and 129 years of a historical constitutional principle were left unchanged by the *express* language of 13.

 If, as is argued by the Board, 13 has in effect repealed article XIII, section 1, it could be only by implication. However, neither the language nor the circumstances surrounding the passage of 13 rebuts the established presumption of constitutional construction disfavoring a repeal by implication (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 174 [74 P.2d 252]). The constitutional guaranty as to fair market value continues in force.

A basic rule of construction provides constitutional amendments must, if at all possible, be interpreted in harmony with other relevant portions of the Constitution. This offers a further answer to an understanding of 13. Article XIII, section 1, provides: "Section 1. Taxable property. Unless otherwise provided by this Constitution or the laws of the United States:

"(a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value.

"(b) All property so assessed shall be taxed in proportion to its full value."

Proposition 13 did not repeal or in any way alter the provisions of article XIII, which presently contains 33 separate sections. Thus, article XIII, section 1, must be given effect.

The first sentence of article XIII, section 1, subdivision (a), provides "[a]ll property is taxable and shall be assessed at the same percentage of fair market value." If article XIII, section 1, ended at that point, it would be in direct and irreconcilable conflict with 13, since 13 uses an acquisition value approach for real property rather than a current fair market value standard. Article XIII, section 1, subdivision (a), however,

also provides "[w]hen a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value." This second sentence clearly provides that a value standard "other than fair market value" may be constitutionally utilized for the taxation and assessment of property.

In order to harmonize article XIII, section 1, subdivision (a), with 13 (before its clarification by 8), the second sentence of section 1, subdivision (a) may be interpreted to read: "When a value standard [other] *lower* than fair market value is prescribed by this Constitution or by Statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value."

Based upon this interpretation, it would be evident the acquisition value of real property set forth in article XIII A (13) could not exceed the actual fair market value of the property by virtue of article XIII, section 1, subdivision (a), as so construed. This was true before the passage of 8 and was further clarified by 8 as will be set forth below.

Using the applicable rules of construction, we find the Board's tax rule (rule 461), as applied, null and void. The intent of the electorate in adopting 13, and the constitutional fair market value limitation are thus given effect and harmonized.

### PROPOSITION 8 IS APPLIED RETROACTIVELY

The rules of statutory construction apply to the interpretation of constitutional amendments such as 8 (*Winchester v. Mabury* (1898) 122 Cal. 522, 527 [55 P. 393]; *Winchester v. Howard* (1902) 136 Cal. 432, 439 [64 P. 692, 69 P. 77]). Accordingly, the issue of retroactivity is resolved by utilizing established rules of statutory and constitutional construction.

The following rules of construction support the retroactive application of 8.

First, our previous citations to *Amador, supra,* 22 Cal.3d 208, at pages 245 to 246, *In re Quinn, supra,* 35 Cal.App.3d 473, at page 483, *Kaiser v. Hopkins, supra,* 6 Cal.2d 537, at page 538, all demonstrate the need to look to the intent of the voters through an analysis of the ballot summary and the voters pamphlet.

The voters pamphlet for 8 stated in part, "[t]he purpose of this measure . . . is to further the intent of Proposition 13 by easing the property tax burden of disaster victims who HAVE RECENTLY lost their homes or suffered real property damage (emp. added)." The words HAVE RECENTLY refer to the recent PAST. The pamphlet uses the 1977 Santa Barbara fire to illustrate the type of property that would benefit from 8.

The date of the election (5 months and 1 day after 13) and the general impression given by reading the pamphlet led the public to believe 8 would become effective at the same time as 13.

Second, a provision should not be interpreted so as to result in absurd consequences. In *Warner* v. *Kenny* (1946) 27 Cal.2d 627, 629 [165 P.2d 889], the court in interpreting a provision of the Elections Code, held: "The interpretation adopted must be reasonable, and where the language is fairly susceptible of two constructions, one which, in application, will render it reasonable, fair, and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted."

■ *Finally*, despite the well established rule of statutory construction which provides a statute will be presumed to operate prospectively only unless the intent that it is to be retroactive clearly appears from the statute itself (*Estate of Potter* (1922) 188 Cal. 55, 65 [204 P. 826]), a statute may be retroactively applied to comport with the presumed legislative intent.

A further exception to this general rule of construction arises when the Legislature merely clarifies existing law (*Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828, fn. 8 [114 Cal.Rptr. 589, 523 P.2d 629]; *Martin* v. *California Mut. B. & L. Assn.* (1941) 18 Cal.2d 478, 483-484 [116 P.2d 71]). Thus, if it can be shown 8 was enacted to clarify the provisions of 13, 8 must be given the same effect "as if embodied in the original [13] at the time of its passage" (*Clayton* v. *Schultz* (1935) 4 Cal.2d 425, 430 [50 P.2d 446]).

Senate Constitutional Amendment No. 67 (SCA 67), placed 8 on the ballot. The Legislative Counsel's Digest made a part of the printed text of the bill, stated: "Existing constitutional law, as revised by the addition of Article XIII A to the California Constitution, limits ad valorem

taxes on real property to 1% of the full cash value of such property, as defined. [¶] This measure would revise the definition of full cash value as it relates to real property reconstructed after a disaster and would make [minor technical] *various clarifying* changes in such definition." (Original italics.) Thus, the Legislative Counsel's Digest which accompanied SCA 67, indicated the portion of 8 dealing with real property reconstructed after a disaster would revise the definition of "full cash value," and the remaining provisions of 8 would merely make "various clarifying changes" (replacing the term "minor technical") in the definition of the term "full cash value."

 It is clear the legislative intent was to make "various clarifying changes" in the definition of "full cash value" as it appeared in 13. Thus, since 8 was clearly intended to *clarify* 13, the rules of construction pertaining to clarifying amendments require that Proposition 8 be given effect as of the effective date of Proposition 13, July 1, 1978.

### Conclusion

The court below based its decision solely on an interpretation of 13 and concluded rule 461(b) of the Board's property tax rules "were, from the outset, and are, erroneous, illegal and unconstitutional." We affirm that finding.

We also find under the applicable rules of statutory construction, as set out above, 8 should be applied retroactively to clarify 13. In either case, the action of the San Diego Board of Supervisors was proper and we affirm the denial of the writ of mandate.

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied June 16, 1980.